**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CALIFORNIA 90071-2300
TELEPHONE: 213.972.4500
FACSIMILE: 213.486.0065

CHRISTOPHER J. HECK, BAR NO. 174647
CHECK@FOLEY.COM

**OF COUNSEL**
BRIAN W. MCGRATH
KELLI A. TAFFORA
**FOLEY & LARDNER LLP**
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202-5306
TELEPHONE:    414.271.2400
FACSIMILE:     414.297-4900
BMCGRATH@FOLEY.COM
KTAFFORA@FOLEY.COM

ATTORNEYS FOR DEFENDANTS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| WATER, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>EVERPURE, INC., EVERPURE, LLC, and PENTAIR, INC.,<br><br>Defendants. | CASE NO:  CV 08-00218 ABC (SS)<br><br>DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS FOR IMPROPER VENUE, OR, IN THE ALTERNATIVE, TO TRANSFER VENUE<br><br>Date:     July 7, 2008<br>Time:    10:00 a.m.<br>Place:    Courtroom 680<br><br>Judge:  The Hon. Audrey B. Collins |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................1

II.  ARGUMENT .....................................................................................................4

    A.   The Dispute Between Everpure and Water Stems From the Agreement and Interpretation of the Agreement is Critical to Resolving the Dispute. ..................................................................................................4

    B.   The Factual Allegations in the Amended Complaint are also an Attempt at Artful Pleading to Avoid the Forum Selection Clause. ......8

    C.   Section 10.9 of the Agreement is a Mandatory Forum Selection Clause. ...................................................................................................11

III. CONCLUSION ................................................................................................14

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Dawn Equip. Co. v. Micro-Trak Sys., Inc.*,
     186 F. 3d 981 ..................................................................................................................13

*Ins. Co. of N.A. v. NNR Aircargo Service, Inc.*,
     201 F.3d 1111 (9th Cir. 2000) ........................................................................................13

*Manetti-Farrow, Inc. v. Gucci Am., Inc.*,
     858 F.2d 509 (9th Cir. 1988) ....................................................................................... 8-9

*Schering Corp. v. First DataBank, Inc.,*
     2007 WL 1176627 at *8 (N.D. Cal. April 20, 2007) ........................................................8

*Wallis v. Princess Cruises, Inc.*,
     306 F.3d 827 (9th Cir. 2002) ..........................................................................................13

**FEDERAL STATUTES**

28 U.S.C. § 1406(a) ................................................................................................................14

**RULES**

Fed. R. Civ. P. 12(b)(3)............................................................................................................14

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Water's opposition to this motion concedes the law, but it ignores the record. Water concedes that a forum selection clause such as that at issue in this case can apply to non contract causes of action, and it even admits that whether the clause applies to such claims depends on whether resolution of those claims relates to interpretation of the contract. Water's Opp. at 14: 20-27. In their opening brief, at pages 10-14, Defendants demonstrated that each of Water's claims in its amended complaint does indeed relate directly to the Select Master Distributor Agreement (the "Agreement"), which has governed the parties' relationship for the last 12 years.

Water has no answer for these arguments, and it instead pretends that they do not exist.[1] It also pretends that its amended complaint does not contain allegations that it does contain,[2] all in a further effort to distance itself from the terms of its Agreement with Everpure, and from the obligations that Agreement creates for Water and defines between the parties. These terms include defining the parties' respective rights to the "Everpure" trademarks (pursuant to Section 6, Water acknowledges the validity and ownership of those trademarks by Everpure), and Water's obligations to remain free from business activities that conflict with its obligations to Everpure. *See* Agreement at § 5.3 (stating that Water "will keep free from interest in or activities of enterprises whose business conflicts or interferes with the supply or service of Everpure products" and that Water "will not have any

---

[1] *Compare, e.g.,* Water's Opp. at 21:5-6 ("Defendants make no effort to explain how Defendants alleged antitrust violations have anything to do with the provisions of the 1996 written Distributor Agreement") *with* Defendants' Opening Brief at 12-14 (providing that explanation).

[2] *Compare, e.g.,* Water's Opp. at 2:10-12 ("The FAC does not raise claims concerning plaintiff's right to use the Everpure mark, but its own rights in its own use of its Ever Brands marks.") *with* Am. Compl. at ¶¶ 8, 11-21, 45, 46, 59, 68-72, 74, 75, 94-99.

interest in or engage in any business, directly or indirectly, selling water filtration products that are competitive or substantially similar to products manufactured by Everpure."). As Defendants explained in their opening brief, both of those obligations, among others, are now of central importance to resolving Water's trademark and antitrust claims, and those claims, like all of the others in the Amended Complaint, are inextricably intertwined with the parties' Agreement. The Court should put an end to Water's efforts to pretend otherwise, and should uphold the forum selection clause and grant Defendants' motion.

Nevertheless, if Court is somehow inclined to take seriously Water's contentions that its First Amended Complaint is completely separate from and actually has nothing to do with the original Complaint that it filed in this case (despite the fact that Water's First Amended Complaint states 12 of the exact same claims as its original Complaint, and alleges a remarkably similar set of facts, pled in a remarkably similar style and substance) and that its original Complaint was withdrawn because Everpure rescinded its notice of termination and not because of Everpure's motion challenging venue, it should consider three additional key questions that Water's brief leaves unanswered:

1.  Water filed its original Complaint on January 11, 2008. As admitted in the declaration submitted by Attorney James Kahn, on behalf of Water on June 23, 2008, Everpure withdrew its notice of termination on January 15, 2008. Water, however, caused its *original* Complaint to be served on Everpure on April 29, 2008, three months after the notice of termination was withdrawn. Why did it do that if the primary basis for the original Complaint was alleged wrongful termination, and Water, and its counsel, not only knew that the notice of termination had been withdrawn, but had accepted the withdrawal and had resumed performance of the Agreement?

2.  If the First Amended Complaint has nothing to do with the original Complaint, and they arise out of completely independent facts and circumstances,

1  then why is it filed as an amended complaint using the same case number as the
2  original Complaint?  Once Water knew that its original Complaint was no longer
3  valid, why did it not simply dismiss the Complaint and then file a new complaint
4  arising out of the allegedly new and distinct facts?

5        3.    If the original Complaint and the First Amended Complaint actually
6  arise out of completely distinct and separate facts, why are the style and substance
7  of the two pleadings so remarkably similar, except for the changes made by Water
8  to avoid even the slightest reference to the existence of the Agreement?

9        Everpure does not ask the above questions idly.  The questions demonstrate
10 that the original Complaint and the First Amended Complaint are not separate and
11 distinct.  The Amended Complaint was not filed because Everpure had withdrawn
12 the notice of termination (that had occurred more than three months before), but
13 was instead filed in response to Everpure's motion to dismiss for improper venue
14 (which occurred 14 days before the filing of the Amended Complaint).  Water
15 should not be permitted to pretend otherwise and, once again, ignore the record in
16 this case.

17       In case the point was not already clear, in this reply brief, Everpure will
18 further show that: (1) the dispute between Everpure and Water originated out of
19 their differing interpretations of the Agreement; (2) that the interpretation of the
20 Agreement is central to resolving this dispute; and (3) Section 10.9 of the
21 Agreement is a mandatory forum selection clause.  Water should not be permitted
22 to avoid these central facts by artful pleading or by pretending the record is
23 different than it is.  As a result, the mandatory forum selection clause in the
24 Agreement between the parties should be enforced, and Defendants' motion to
25 dismiss for improper venue should be granted.
26 ///
27 ///
28 ///

3
DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS FOR IMPROPER VENUE
CASE NO.: CV-08-00218ABC

LACA_1869993.1

## II. ARGUMENT

### A. The Dispute Between Everpure and Water Stems From the Agreement and Interpretation of the Agreement is Critical to Resolving the Dispute.

In its Opposition, Water contends that its primary claims in the First Amended Complaint are trademark and antitrust claims which, it further contends, are not governed by the Agreement. Water's Opp. at 3-4, 13-14. Everpure will deal with the trademark related claims first.

In making its argument about the trademark claims, Water ignores Section 6 of the Agreement and ignores its own allegations in the First Amended Complaint. For example, in paragraphs 8, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 45, 68-70, and 94 of the First Amended Complaint, Water asserts that it has legal rights in the Everpure trademark (not the Ever Hot and Ever Cold trademarks, but in the Everpure mark). These allegations by Water are directly inconsistent with Section 6 of the Agreement that states as follows:

> [Water] acknowledges the validity and ownership by Everpure of the registered trademarks "Everpure" and the wavy "E" design, and will respect the rights of Everpure and its related companies in their other trademarks, trade names and other designations, patents, copyrights and trade secrets. [Water] will use such intellectual property only as authorized by Everpure. [Water] will not use separate trademarks or other trade dress on Products, except as authorized by Everpure.

In its Lanham Act claim (3rd claim for relief), Water, Inc. even asserts that its rights to the Everpure trademark are *superior* to Everpure's own rights in its own trademark, and Water's allegedly superior rights form the basis for its Lanham Act claim and a number of its other claims. Am. Compl., ¶¶ 46, 70, 72, 74-75, 94-

4

1  99. As a result, Water asks that Everpure be enjoined from selling water chillers or
2  instant hot products under Everpure's own trademark.  Those same allegations and
3  claims are made in the seventh, eighth, and thirteenth claims for relief.
4       How can any court adjudicate these claims without determining the parties'
5  rights as set forth in Section 6 of the Agreement relating to the Everpure
6  trademarks?  The short answer is that no court could do so.  Construing Section 6
7  of the Agreement is, thus, critically important to the very claims that Water now
8  says are its primary claims in the First Amended Complaint.
9       Water also asserts in its opposition brief that its antitrust claims,[3] have
10  nothing to do with the Agreement, and, inexplicably, argues that in Everpure's first
11  brief, Everpure made "no effort to explain how Defendants' alleged anti-trust
12  violations have anything to do with the provisions of the 1996 written Distributor
13  Agreement." *Id.* at 21.  Of course, Everpure addressed this exact point at pages 12-
14  14 of its opening brief.  As Everpure explained there, the essence of Water's claim,
15  to the extent it can be understood, is that Everpure is engaging in monopolistic
16  conduct by refusing to sell products to Water's existing customers if they continue
17  to do business with Water.  Am. Compl. ¶¶ 31, 38, 49, 55.  These allegations are
18  false, and they are contradicted by Water's allegations in its Lanham Act claim
19  which seek to *prevent and enjoin* Everpure from selling competing products under
20  the Everpure mark (that is, Water alleges that Everpure is both selling Everpure
21  products to Water's customers and refusing to sell Everpure products to
22  Water' customers, and that both actions are illegal).  But, even assuming the

---

[3] Water's claims lack even the most basic elements required in any antitrust case. Among other things: they do not attempt to define a product or geographic market; do not allege a "contract, combination or conspiracy" between unrelated entities (even though the first claim is styled as "For Violation of the Sherman Anti-Trust Act, 15 U.S.C. § 1" as well as § 2) or a "trust" (even though the fourth claim is under California's Cartwright Act, which only bans trusts); and do not allege that Defendants, through their actions, have obtained monopoly power or a dangerous probability of obtaining monopoly power in any defined market, even though they purport to state claims for monopolization.

allegations are true, Everpure generally has a right to sell or to refuse to sell to whomever it chooses. And, in this case, determining whether Everpure engaged in improper "coercive tactics" will require a court to determine the parties' respective rights and obligations while the Agreement was in effect because, as explained below, all of the alleged conduct occurred while the Agreement was still in effect. The conduct logically had to pre-date the First Amended Complaint (filed on June 2, 2008), otherwise there would be no good faith basis to allege the conduct. In the First Amended Complaint, Water itself asserts that it gave notice of termination of the Agreement on May 22, 2008. Am. Compl. ¶ 11.[4] This means that pursuant to Section 9 of the Agreement, the earliest date that the Agreement could be terminated was 30 days thereafter, *i.e.*, June 21, 2008. Therefore, the Agreement was in force up to and past the date of the First Amended Complaint, and any conduct must be judged in light of the terms of the Agreement.

The Agreement gives Water exclusive territory in this region, restricts Water from engaging in activities with companies whose business conflicts with Everpure, and limits Water's use of Everpure's trademarks. *See* Agreement at §§ 1.2, 1.3, 5.3, 6 and Sched. A. Everpure had and has a right to enforce the terms of the Agreement, including the exclusivity and non-conflicts provisions. Thus, any conduct alleged by Water during this period of time must be judged in the context of the parties' rights and obligations under the Agreement.

In fact, as shown in Everpure's original brief, the interpretation of the terms in the Agreement will be critical in determining the outcome of all of the disputes between Water and Everpure. This can be seen even more clearly when the Court examines how this dispute began. As set forth in the October 31, 2007 letter from Everpure to Water (attached as part of Exhibit "A" to the Declaration of James

---

[4] Everpure will establish in this case that the May 22, 2008 notice from Water was, itself, a breach of the Agreement by Water.

6
DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS FOR IMPROPER VENUE
CASE NO.: CV-08-00218ABC

Kahn filed by Water), Everpure sent a notice to Water stating that Water was in breach of the Agreement by, among other things:

- Violating section 5.2 of the Agreement by not purchasing all of Water, Inc.'s requirements for water treatment products from Everpure.
- Violating section 5.3 of the Agreement by engaging in business activities that conflict or interfere with the supply or service of Everpure products and by having an interest in and selling water filtration products that are competitive or substantially similar to products manufactured by Everpure.
- Violating Section 5.5 of the Agreement by not operating in compliance with all applicable laws and by failing to conform its sale and service practices to the highest standards of honesty, integrity and fair dealing.
- Violating sections 5.8 and 6 of the Agreement and the Everpure Brand Logo Guidelines by not respecting the validity and ownership by Everpure of the registered trademarks of Everpure.
- Violating Section 9.1(b)(2) of the Agreement by engaging in conduct that is likely to deceive the public as to the source, nature or quality of products or services offered by Water, Inc. or that is likely to impair the name, trademark or reputation of Everpure.

Each of these breaches is a reference either to Water's conduct involving Ever Hot and Ever Cold products or to Water's conduct regarding the Everpure marks. Everpure contends that Water's conduct with respect to these matters has been unlawful and in breach of the Agreement.[5]  Water disagrees.  Given that the

---

[5] In its Brief, Water claims that Everpure does "not dispute that [Everpure] permitted plaintiff to make use of the Everpure trademark in combination with plaintiff's Ever Brands marks for over thirty years." (Water Br. 20).  Everpure has not yet filed an answer in this matter, so it is unclear when exactly Everpure was

dispute started with, and centers upon the contractual provisions set forth in Water's October 31, 2007 notice, it would be impossible for the dispute to be resolved without a determination as to whether Everpure's or Water's interpretation of the Agreement is correct with respect to these issues.

While Water spends an inordinate amount of space in its brief attempting to distinguish the numerous cases cited by Everpure in its original brief, as explained above, Water concedes at page 14 of its brief that a contractual forum selection clause "can be equally applicable to contractual <u>and</u> tort causes of action." (emphasis added). In fact, Water concedes that this premise is widely accepted. *Id.* In light of what amounts to dispositive Ninth Circuit authority on this point, (*see Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509 (9th Cir. 1988)), Water could do nothing else. Thus, the only issue is whether resolution of the claims in this case relates to interpretation of the Agreement. If so, then Water concedes that the forum selection clause in the Agreement controls. As shown above, it is impossible to resolve Water's claims without resort to interpretation of the Agreement between the parties.[6]

## B. The Factual Allegations in the Amended Complaint are also an Attempt at Artful Pleading to Avoid the Forum Selection Clause.

In its Motion to Dismiss, Everpure showed the Court how Water's new allegations in its First Amended Complaint were nothing more than artful pleading in a transparent effort to avoid mention of the Agreement. In response, Water

---

supposed to raise such dispute. Regardless, Everpure does dispute that contention, and such dispute is very much at the heart of the matter.

[6] In the one case that Water cites to in its favor on this topic, the Court refused to apply a forum selection clause that was "wholly divorced from the existence of the agreement" and where "the agreement played no role in giving rise to the[] claims." *See Schering Corp. v. First DataBank, Inc.*, 2007 WL 1176627, at * 8 (N.D. Cal. April 20, 2007). Water cannot honestly argue that the Agreement played no role in giving rise to its claims. It wouldn't even have a dispute with Everpure over the use of its Ever Brand trademarks and/or Everpure's use of its own trademark if it had not been an Everpure distributor.

argues that, although the claims are alike, "the operative factual allegations of the [First Amended Complaint] *are different* from the original complaint" and that "[Everpure] entirely ignore[s] [Water's] factual allegations of the First Amended Complaint." (*Id*. at 5, 7) (emphasis in original).  Everpure is not ignoring the factual allegations.  Even a cursory look at the factual allegations in the two complaints shows that the allegations in the Amended Complaint are also crafted in a way that attempts to avoid revealing their obvious dependence on the Agreement.  The following comparisons are just a few of the examples that highlight Water's attempt at pleading *of the facts* to avoid the forum selection clause:

| ORIGINAL COMPLAINT | FIRST AMENDED COMPLAINT |
|---|---|
| "***Prior to entering into the Distributor Agreement with Everpure***, defendant Everpure, Inc. knew and was informed that Water was using the trademarks Everhot, Evercold and Everbrew in commerce.  At all relevant timed alleged herein Defendants, and each of them, encouraged Water to sell the Everpure water filtration device as part of a product package that included these Water products in order to increase the sales of Defendants' Everpure products, and expressly and implicitly approved of the sale of the Everpure water filtration device as part of this product package offered by Water." (Compl. ¶ 12) (emphasis added). | "***At all relevant times alleged herein***, defendant Everpure, Inc. knew and was informed that Water was using the trademarks Everhot, Evercold and Everbrew in commerce.  At all relevant timed alleged herein defendants, and each of them, encouraged Water to market, distribute and sell the Everpure water filtration devices under the trademark "Everpure" as part of a product package of Ever Brands products in order to increase the sales of Defendants' Everpure products, and expressly and implicitly approved of the marketing, distribution and sale of the Everpure water filtration device under the trademark 'Everpure' as part of this product package offered by Water.  (Am. Compl. ¶ 12) (emphasis added).[7] |

---

[7] This paragraph 12 of the Amended Complaint alone shows how dependent

| ORIGINAL COMPLAINT | FIRST AMENDED COMPLAINT |
|---|---|
| "***After entering into the Distributor Agreement***, and in reliance upon the approval, authorization and consent of Defendants, and each of them, to sell the Everpure water filtration device as part of a package that included Everhot, Evercold, and Everbrew products of Water, Water commenced selling and has continuously sold to the present date the Everpure water filtration device as part of a package with its Everhot, Evercold, and Everbrew products."  (Compl. ¶ 13) (emphasis added). | "***In reliance upon the approval, authorization and consent of Defendants***, and each of them, to sell, market and distribute the Everpure water filtration devices under the trademark 'Everpure' as part of a package that included Everhot, Evercold, and Everbrew products of Water, Water commenced selling, marketing and distributing the products in conjunction with the 'Everpure' mark and has continuously and exclusively sold, marketed and distributed to the present date the Everpure water filtration devices under the mark 'Everpure' in the Western states as part of a package with its Everhot, Evercold, and Everbrew products."  (Am. Compl. ¶ 13) (emphasis added). |

///

///

///

///

///

///

///

///

///

Water's factual allegations are on the Agreement.  Of course Everpure "acquiesced" to Water's exclusive use of the 'Everpure' trademark in the Western states for almost thirty years- the parties had an agreement so stating which was codified in the Select Master Distributor Agreement.

10
DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS FOR IMPROPER VENUE
CASE NO.: CV-08-00218ABC

LACA_1869993.1

| ORIGINAL COMPLAINT | FIRST AMENDED COMPLAINT |
|---|---|
| "After Pentair, Inc. acquired a controlling interest in Everpure in or around 2003-2004, it began to expand the products available for sale by its Master Distributors. Among these products, were products that performed the same or similar function as Water's Everhot and Evercold products. None of these new products offered by Everpure were manufactured by Everpure. Moreover, notwithstanding the addition of these products to its product line, ***Pentair and Everpure allowed the Distributor Agreement to renew in February of 2006 for an additional five year term,*** and implicitly and expressly authorized Water to continue to sell Everpure water filtration devices as part of a package with Everhot, Evercold, and Everbrew." (Compl. ¶ 19). | "After Pentair, Inc. acquired a controlling interest in Everpure in or around 2003-2004, it began to expand the products available for sale by its Master Distributors. Among these products, were products that performed the same or similar function as Water's Everhot and Evercold products. None of these new products offered by Everpure were manufactured by Everpure. Moreover, notwithstanding the addition of these products to its product line, ***Pentair and Everpure implicitly and expressly authorized, encouraged and consented to Water's marketing, distribution and sale of Everpure water filtration devices under the mark 'Everpure'*** as part of a package with Everhot, Evercold, and Everbrew." (Am. Compl. ¶ 23). |

Whether Water wants to call it a change in "format" or "substance," it is clear that the Amended Complaint is nothing other than an attempt to plead around the fact that Water's claims are entirely dependent upon an interpretation and application of the Agreement.

### C. Section 10.9 of the Agreement is a Mandatory Forum Selection Clause.

On page 5 of its Brief, Water has a heading stating that "Paragraph 10.9 is Not a 'Forum Selection Clause'." On page 22, Water calls it a "Purported Forum Selection Clause." On page 22, Water again states that Everpure is seeking to "take advantage of what [it] erroneously refer[s] to as a 'forum selection clause.'" Water then goes on to argue the inapplicability of "the so-called 'forum selection' clause'" for the remainder of its Brief. But, regardless of how Water's attorneys

11

want to label the clause, it is clear that the parties to the Agreement intended it to be a forum selection clause, *because that is what they said it was.* As repeated herein for the third time, the full clause states as follows:

> This agreement is made in and will be construed under the laws of the State of Illinois, where the executive offices of Everpure are located. Since Everpure and Master Distributor have a significant interest in consistent interpretation of this Agreement, and Everpure expects to have Select Master Distributors throughout the United States, Everpure and Master Distributor irrevocably submit, and waive any objection either may have, to personal jurisdiction or venue in the state and federal courts of applicable subject matter jurisdiction where Everpure's executive offices are located in Illinois. **All remedies provided in this agreement are cumulative and, <u>*except for forum selection under this Section*</u>, are in addition to any remedy otherwise available under applicable federal, state or local law.** (emphasis added).

As is clear from the very last sentence of the clause, the parties expressly and contractually agreed that the clause is indeed a forum selection clause. Moreover, by including the "except for" language, it is undisputable that the clause is mandatory. In the very last sentence, the parties expressly agreed that remedies are cumulative – EXCEPT FOR THE SELECTED FORUM CLAUSE. Thus, the parties might have claims and remedies in addition to (i.e., cumulative to) the rights and remedies set forth in the Agreement, but there was no forum in addition to (i.e., cumulative to) the forum selected by the parties in the Agreement. For this reason, and in addition to the reasons stated in Everpure's opening brief, Water

1 agreed by contract that the forum selection clause is indeed a forum selection
2 clause, and the parties intended it to be mandatory and exclusive.
3     There is no need to consider cases where ambiguities arise, because there is
4 no ambiguity.  Moreover, the other cases Water cites are completely inapplicable
5 as they involved liability limitations in adhesion contracts.  *See Wallis v. Princess*
6 *Cruises, Inc.*, 306 F.3d 827 (9th Cir. 2002); *Ins. Co. of N.A. v. NNR Aircargo*
7 *Service, Inc.*, 201 F.3d 1111 (9th Cir. 2000).  Finally, as also pointed out by
8 Everpure in its opening brief, an ambiguity is not to be construed against the
9 drafter when the other party was represented by counsel.  *See Dawn Equip. Co. v.*
10 *Micro-Trak Sys., Inc.*, 186 F. 3d 981, 989, fn. 3 (7th Cir. 1999) ("The principle that
11 ambiguity should be construed against the drafter does not control because we deal
12 with a negotiated contract between sophisticated commercial clients 'advised by
13 counsel and having equal bargaining power.'").  As pointed out in Everpure's
14 original brief, Water was represented by counsel during the negotiations for the
15 Agreement.  Everpure's Opening Brief at 17, n. 3.  Thus, the legal principle upon
16 which Water relies does not apply.
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

### III. CONCLUSION

For the foregoing reasons, and the reasons set forth in Everpure's Opening Brief, this Court should dismiss the Amended Complaint and this action for improper venue pursuant to Fed. R. Civ. P. 12(b)(3). In the alternative, Everpure requests that the Court transfer venue in this action to the Northern District of Illinois, pursuant to 28 U.S.C. § 1406(a).

Dated: June 30, 2008

FOLEY & LARDNER LLP
CHRISTOPHER J. HECK

By: /s/
CHRISTOPHER J. HECK

OF COUNSEL:

BRIAN W. MCGRATH
KELLI A. TAFFORA
FOLEY & LARDNER LLP
777 EAST WISCONSIN AVENUE
MILWAUKEE, WISCONSIN 53202
PHONE: 414.271.2400
FACSIMILE: 414.297.4900

Attorneys for Defendants
Everpure, Inc., Everpure, LLC and Pentair, Inc.